UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| CODY J. HUBER, | CASE NO. 1:23-CV-1546-DCN |
| Plaintiff, | JUDGE DONALD C. NUGENT |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

### INTRODUCTION

Plaintiff Cody J. Huber challenges the Commissioner of Social Security's decision denying supplemental security income (SSI). (ECF #10 at PageID 1492). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On August 8, 2023, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry dated Aug. 8, 2023). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the Commissioner's decision.

### PROCEDURAL BACKGROUND

Mr. Huber applied for SSI on June 4, 2021, alleging a disability onset date of January 1, 2021. (Tr. 149). The application was denied initially and on reconsideration. (Tr. 79, 92). Mr. Huber then requested a hearing before an Administrative Law Judge. (Tr. 6). Mr. Huber (represented by counsel) and a vocational expert (VE) testified on August 15, 2022. (Tr. 35). On

1

September 14, 2022, the ALJ determined Mr. Huber was not disabled. (Tr. 28). The Appeals

Council denied Mr. Huber's request for review on June 9, 2022, making the hearing decision the

final decision of the Commissioner. (Tr. 1; *see* 20 C.F.R. §§ 416.1455 and 416.1481). Mr. Huber

timely filed this action on August 8, 2023. (ECF #1).

FACTUAL BACKGROUND

## I.      Personal and vocational evidence

Mr. Huber was 24 years old on the alleged onset date and 25 years old at the administrative

hearing. (Tr. 27). He completed a high school education after attending seventh grade in school

then being homeschooled after that. (Tr. 45). But Mr. Huber does not have a high school diploma

because he did not pass required state standardized tests. (Tr. 41-42). He does not have a driver's

license. (Tr. 50). He has no past relevant work experience. (Tr. 27, 155).

## II.     Relevant medical evidence

Mr. Huber has been diagnosed with major depressive disorder, generalized anxiety

disorder, and agoraphobia with panic disorder. (Tr. 279, 421). His anxiety increases when

interacting with others, where he describes that he is "unable to find the right words." (Tr. 42,

659). His anxiety affects his interactions with medical providers and his daily life, such as

shopping. (Tr. 43). He does not have any friends with whom he interacts. (Tr. 44). Mr. Huber's

agoraphobia limits his ability to leave his house on his own. (Tr. 190). He experiences panic attacks

if he enters stores, sits in parking lots, is in open spaces, or stands in lines. (*Id.*). He can go out on

occasion with his father or brothers, but he is never dropped off alone. (Tr. 48-49, 51-52). Even if a

family member can go with him, he testified he still cannot leave his house due to anxiety about

three to four times a week. (Tr. 49).

Mr. Huber began mental-health treatment prior to the January 1, 2021 alleged onset-of-disability date. On November 24, 2020, Mr. Huber began mental-health treatment at the Charak Center for Health and Wellness with weekly telehealth visits. (Tr. 359). At that time, Mr. Huber had been previously diagnosed with major depressive disorder and generalized anxiety disorder. (Tr. 365). In the progress notes to his telehealth visit, Mr. Huber reported experiencing depressive feelings, irritability, racing thoughts, anxiety, weekly panic attacks, agoraphobia, oversleeping, low energy, and poor concentration. (Tr. 359-60).

On November 27, 2020, Mr. Huber was prescribed Lexapro[1] as an antidepressant and Klonopin[2] to control his panic attacks. (Tr. 352, 357). On December 1, Mr. Huber reported he still had bad anxiety and daily panic attacks with no identifiable trigger, despite reporting his medication helped him. (Tr. 349). His care provider increased the dosage of both of his prescriptions. (Tr. 353). On December 9, he reported that his depression improved a little, but his panic attacks and anxiety persisted. (Tr. 344). Mr. Huber was prescribed buspirone[3] to manage his residual daytime anxiety. (Tr. 348). However, he reported the following week on December 15 that the buspirone did not affect his anxiety. (Tr. 340). Mr. Huber's buspirone dosage was increased and he was recommended to start counseling. (Tr. 342). By December 29, Mr. Huber reported that Klonopin helped alleviate his anxiety for about five to six hours. (Tr. 328).

---

[1]     Lexapro is a brand name for escitalopram, a selective serotonin reuptake inhibitor prescribed to treat depression and anxiety in children and adults. *Escitalopram*, *MedlinePlus*, https://medlineplus.gov/druginfo/meds/a603005.html (last accessed July 8, 2024).

[2]     Klonopin is a brand name for clonazepam, a benzodiazepine prescribed to control panic attacks. *Clonazepam*, *MedlinePlus*, https://medlineplus.gov/druginfo/meds/a682279.html (last accessed July 8, 2024).

[3]     Buspirone is an anxiolytic prescribed to treat anxiety. *Buspirone*, *MedlinePlus*, https://medlineplus.gov/druginfo/meds/a688005.html (last accessed July 8, 2024).

Mr. Huber continued treatment after January 1, 2021. On January 5, 2021, Mr. Huber reported his depression symptoms waxed and waned and he had trouble sleeping. (Tr. 323). He was prescribed Remeron[4] to aid his sleep, anxiety, and depression. (Tr. 326). On January 14, Mr. Huber reported doing well, "denie[d] all mental health symptoms," and was satisfied with his medication regimen. (Tr. 314). On January 22, his progress note detailed he "denie[s] mood symptoms of feelings of worthlessness, sad, depressed, hopeless or guilty" but "he worries he has not improved." (Tr. 300). He reported anxiety and panic attacks when outside of his home, in enclosed places, and waiting in line. (*Id.*). He endorsed staying at home to avoid feeling panic. (*Id.*).

Though Mr. Huber was scheduled for a follow-up two weeks later, the next progress note in the administrative record is dated March 31, 2021, two months later. (Tr. 309). In that note, Mr. Huber "denied racing thoughts, anxiety, depression, and mood swings" and reported "[t]herapy was going good." (*Id.*). That note also indicated Mr. Huber was prescribed hydroxyzine[5] beginning in February. (Tr. 312). His condition at that time compared to when he was admitted was rated "very much improved" and he was scheduled for monthly follow-ups. (Tr. 313). On April 28, he "denied racing thoughts, anxiety, depression, and mood swings" and stated "[t]herapy was going good." (Tr. 295). His medications were unchanged since he was prescribed hydroxyzine in February. (*Compare* Tr. 297-98 *with* Tr. 311-12). His condition compared to when he was admitted in January was again rated "very much improved." (Tr. 299). On May 26, he "denied racing

---

[4]      Remeron is a brand name for mirtazapine, an antidepressant. *Mirtazapine*, *MedlinePlus*, https://medlineplus.gov/druginfo/meds/a697009.html (last accessed July 8, 2024).

[5]      Hydroxyzine is an antihistamine prescribed alone or in conjunction with other medications to relieve anxiety and tension, among other things. *Hydroxyzine*, *MedlinePlus*, https://medlineplus.gov/druginfo/meds/a682866.html (last accessed July 8, 2024).

thoughts, anxiety, depression and mood swings" and stated "[t]herapy was going good." (Tr. 289).

He reported one panic attack though his anxiety symptoms had improved. (*Id.*).

Though Mr. Huber was scheduled for a follow-up two weeks later, the next progress note in

the administrative record is dated June 23, 2021, a month later. (Tr. 283). In that note, Mr. Huber

"stated he had anxiety and depression" but his "symptoms had improved" and "[t]herapy was going

good." (Tr. 283). His course of medications was unchanged. (Tr. 280-81). On July 21, his "anxiety

and depression[] symptoms had remained [t]he same," while "[t]herapy was going well." (Tr. 271).

By August 10, he "denied racing thoughts, anxiety, depression, and mood swings." (Tr. 402). But

by August 24 his anxiety returned, which he attributed to life stressors, though he denied

experiencing depression. (Tr. 327). On September 7, he reported his anxiety and depression had

returned. (Tr. 392). By September 24, his anxiety and depression had worsened. (Tr. 387). In

response, his care provider increased his Remeron prescription and decreased his Lexapro

prescription because he complained it had a decreased efficacy. (Tr. 391).

On October 1, 2021, Mr. Huber reported his anxiety and depression symptoms had

deteriorated and he reported multiple panic attacks, though he indicated therapy was going well.

(Tr. 381). In response, his care provider prescribed Prozac[6] and further decreased his Lexapro

prescription. (Tr. 385). On October 8, he "denied depression mood swings, and racing thoughts,"

but reported experiencing anxiety, though his symptoms were improving, and that "[t]herapy had

been good." (Tr. 376). He reported his symptoms were unchanged on October 15. (Tr. 622). His

care provider further decreased his Lexapro and increased his Prozac dosages. (Tr. 626). He

---

[6]     Prozac is a brand name for fluoxetine, a selective serotonin reuptake inhibitor that
is prescribed to treat depression, among other uses. *Fluoxetine*, *MedlinePlus*,
https://medlineplus.gov/druginfo/meds/a689006.html (last accessed July 8, 2024).

reported his symptoms were unchanged on October 22 and October 29. (Tr. 616, 610). On October 29, his care provider increased his Prozac dosage. (Tr. 614).

By November 5, Mr. Huber reported his symptoms improving. (Tr. 605). However, on November 10, he reported his anxiety had worsened while his depression improved. (Tr. 599). Those symptoms remained unchanged on November 23. (Tr. 593). In response, his care provider prescribed gabapentin[7] for his anxiety and reduced his hydroxyzine prescription due to its waned effectiveness. (Tr. 597). On November 30, he reported his anxiety had improved and "denied racing thoughts, depression, and mood swings." (Tr. 587). On December 7, he reported his anxiety stayed the same, but his depression had worsened, so his care provider further reduced his hydroxyzine. (Tr. 581, 585). On December 21, he "denied racing thoughts, depression, and mood swings" but reported his anxiety symptoms were unchanged while "[t]herapy was going good." (Tr. 575). In response, his care provider increased his gabapentin dosage. (Tr. 579).

On January 4, 2022, Mr. Huber reported experiencing anxiety and depression although his "[t]herapy was going good." (Tr. 569). Those symptoms remained unchanged on January 14 and January 21. (Tr. 563, 557). In response, his care provider increased his gabapentin dosage and added a vitamin D supplement. (Tr. 561). Mr. Huber's symptoms were unchanged by January 28. (Tr. 551). That day, his care provider increased his Prozac dosage. (Tr. 555). On February 4, Mr. Huber denied experiencing depression and reported his anxiety symptoms had improved. (Tr. 545). But on February 14 he reported his depression had returned and his anxiety had

---

[7]      Gabepentin is an anticonvulsant used commonly to control seizures, among other uses, by decreasing abnormal excitement in the brain. *Gabapentin*, *MedlinePlus*, https://medlineplus.gov/druginfo/meds/a694007.html (last accessed July 8, 2024).

worsened. (Tr. 537). In response, his care provider increased his Klonopin dosage and decreased his gabapentin dosage. (Tr. 542).

On March 1, Mr. Huber denied feeling depressed and reported his anxiety symptoms had improved. (Tr. 532). His care provider further decreased his gabapentin dosage. (Tr. 537). On March 8, he reported his depression had worsened while his anxiety was unchanged. (Tr. 527). On March 15, he reported both his depression and his anxiety had deteriorated. (Tr. 521). His care provider further decreased his dosages of gabapentin and Remeron and increased his Prozac dosage. (Tr. 524). On March 22, Mr. Huber denied experiencing depression but reported his anxiety had remained the same. (Tr. 510). He reported the same symptoms on April 5. (Tr. 504). On May 3, he denied feeling depressed, but reported his anxiety had remained the same and reported a panic attack. (Tr. 498). In response, his care provider increased his Prozac dosage to address his anxiety. (Tr. 502-03).

On April 28, 2022, Mr. Huber started receiving testosterone injections. (Tr. 473). He received regular testosterone injections every two weeks. (Tr. 473, 467, 461, 455). On May 17, Mr. Huber denied depression and anxiety, though he reported a panic attack. (Tr. 492). On June 7, he denied depression though reported his anxiety symptoms had stayed the same. (Tr. 486).

### III.    Relevant medical opinions

On August 26, 2021, in connection with the initial state agency determination on Mr. Huber's disability application, state agency psychological consultant Cindy Matyi, Ph.D., evaluated Mr. Huber's concentration, social, and adaption limitations based on a review of his mental health records. (Tr. 63). Dr. Matyi opined Mr. Huber could comprehend and remember a variety of task instructions, carry out simple (*i.e.*, 1-2 step) and occasional complex/detailed (*i.e.*, 3-4 step) tasks, maintain attention, make simple decisions, and adequately adhere to a schedule. (Tr. 66-67). Dr.

Matyi also noted Mr. Huber would need a relatively isolated workstation and supervisory support when first learning tasks. (Tr. 67). Dr. Matyi opined that although Mr. Huber may misinterpret interpersonal nuance, he could relate adequately on a superficial basis in an environment that entails infrequent public contact, minimal interaction with coworkers, and no over-the-shoulder supervisor scrutiny. (*Id.*). Dr. Matyi noted Mr. Huber could adapt to a setting where duties are routine and predictable in which changes are infrequent, explained in advance, and introduced slowly. (Tr. 68).

On November 17, 2021, Mr. Huber's treating nurse practitioner, Nicole Berry, N.P., completed a medical source statement in connection with his disability application. (Tr. 421). Mr. Huber's diagnoses were generalized anxiety disorder, major depressive disorder, and agoraphobia with panic. (*Id.*). NP Berry opined Mr. Huber would need breaks four to five times more often than every two hours of an eight-hour workday due to his mental health. (*Id.*). NP Berry estimated Mr. Huber would be off-task 20% or more of an eight-hour workday. (*Id.*). NP Berry opined Mr. Huber would be unable to engage in socially appropriate interactions with coworkers or engage in appropriately deferential interactions with supervisors over 30% of the time. (*Id.*). NP Berry noted that in the alternative, Mr. Huber would "require more than ordinary supervision (extra time or patience)" because of his mental health diagnoses. (*Id.*). NP Berry estimated Mr. Huber would likely be absent, late, or must leave work early due to his mental health four times or month or more. (*Id.*). NP Berry explained these conclusions writing, stating: "He has agoraphobia, panic attacks, major depression, anxiety, and he has trouble with ADL's." (*Id.*).

On December 21, 2021, in connection with Mr. Huber's request for reconsideration, state agency medical psychologist Jennifer Swain, Psy.D., evaluated Mr. Huber based on a review of his

mental health and medical records. (Tr. 71). Dr. Swain reached the same conclusions as Dr. Matyi regarding Mr. Huber's concentration, social, and adaption limitations. (*Compare* Tr. 75-76 *with* Tr. 66-68). But Dr. Swain concluded Mr. Huber was markedly limited (as opposed to moderately limited) in his ability to interact appropriately with the general public. (*Contrast* Tr. 76 *with* Tr. 67).

## IV.    Relevant testimonial evidence

On August 17, 2022, Mr. Huber participated in a remote hearing via teleconference before the ALJ. (Tr. 35). There, the ALJ posed to the VE a hypothetical individual with no past work who can perform work at all exertional levels; must work in a static work environment; is limited to simple, routine, repetitive tasks; is limited to occasional interaction with coworkers; is limited to occasional superficial interaction with the public; and cannot perform any tasks involving arbitration, negotiation, confrontation, responsibility for the safety of others, or directing the work of others. (Tr. 56-57). The ALJ did not expressly identify the hypothetical individual as having Mr. Huber's age or education. The VE opined that such a person could perform work in the national economy as a merchandise marker, router, or sorter of small parts. (Tr. 57).

The ALJ changed the hypothetical individual to limit the person to working in complete isolation and asked if that individual could perform the jobs cited by the VE. (Tr. 58). The VE explained that the Dictionary of Occupational Titles did not discuss working in isolation, but based on her education, experience, and knowledge, the VE concluded an employer would have to make an accommodation for that individual. (*Id.*). Without that accommodation, the individual would be precluded from competitive employment. (Tr. 60).

The ALJ further changed the hypothetical to add that the individual requires occasional supervision and asked if that individual could perform the jobs cited by the VE. (Tr. 58-59). The VE explained the DOT did not discuss supervision, but based on her education, experience, and

knowledge, the VE concluded the individual could perform those jobs with occasional supervision. (Tr. 59). The VE explained that supervision of being told daily what to do on the job is an accommodation not preclusive to competitive employment. (*Id.*).

Finally, the ALJ changed the hypothetical individual to add that the individual needs frequent breaks away from people and would be off task for 20 percent of any given workday. (Tr. 59-60). The VE opined, again based on her education, experience, and knowledge, that any individual who is off task more than 20 percent of a workday would require an appropriate accommodation by the employer. (Tr. 60).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1.    Was claimant engaged in a substantial gainful activity?

2.    Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.    Does the severe impairment meet one of the listed impairments?

4.    What is claimant's residual functional capacity and can claimant perform past relevant work?

> 5.    Can claimant do any other work considering her residual functional capacity,
>       age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

### THE ALJ'S DECISION

At Step One, the ALJ determined Mr. Huber had not engaged in substantial gainful activity since June 4, 2021. (Tr. 20). At Step Two, the ALJ identified the following severe impairments: "major depressive disorder, generalized anxiety disorder, and panic disorder." (*Id.*).

At Step Three, the ALJ found Mr. Huber did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment. (Tr. 21). Specifically, the ALJ considered Listings 12.04 (depressive, bipolar, and related disorders) and 12.06 (anxiety and obsessive-compulsive disorders). (*Id.*)

The ALJ determined Mr. Huber did not meet the requirements for Listings 12.04 and 12.06 because he did not meet the functional criteria laid out in each listing's paragraph B. Those listings share a set of criteria that evaluate the mental functioning of a claimant. *See* Listing 12.04(B), 12.06(B); *see also* Listing 12.00(E)-(F) (explaining "Paragraph B criteria"). (Tr. 107). To satisfy the Paragraph B criteria, a claimant must have one extreme limitation or two marked

11

limitations in four broad areas of functioning.[8] The ALJ determined Mr. Huber had moderate limitations in the areas of understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (*Id.*).

At Step Four, the ALJ determined Mr. Huber's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that [Mr. Huber] has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: [Mr. Huber] is limited to a static work environment, tolerating few changes in a routine work setting and when said changes do occur, any changes in job duties will be explained. [Mr. Huber] is limited to simple, routine, repetitive tasks. [Mr. Huber] is limited to occasional interaction with coworkers. [Mr. Huber] is limited to occasional, superficial interaction with the public. For example, if a member of the public were to approach and ask for directions to the nearest restroom, he would be able to provide that information, but that would be the extent of the interaction. [Mr. Huber] is limited to work that does not involve any work tasks that require arbitration, negotiation, confrontation, being responsible for the safety of others, or directing the work of others.

(Tr. 22). The ALJ then found Mr. Huber had no past relevant work. (Tr. 27).

At Step Five, the ALJ determined there are jobs in significant numbers in the national economy that Mr. Huber can perform given his age, education, work experience, and RFC. (*Id.*). The ALJ cited merchandise marker, router, and sorter of small parts. (Tr. 28). Therefore, the ALJ concluded Mr. Huber was not disabled. (*Id.*).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the

---

[8]    An "extreme limitation" is the inability to function independently, appropriately, or effectively, and on a sustained basis. Listing 12.00(F)(2)(e). A "marked limitation" is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis. Listing 12.00(F)(2)(d).

correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters,* 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.,* 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.,* 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports the ALJ's

13

decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

## DISCUSSION

Mr. Huber raises three issues for review:

1.  The ALJ erred in the finding of RFC where he failed to adequately assess opinion evidence and prior administrative findings where all sources documented greater limitation in Mr. Huber's ability to function in the workplace.

2.  The ALJ erred in the finding of RFC where he failed to provide appropriate analysis of symptoms beyond boilerplate language, failing to even mention Mr. Huber's hearing testimony concerning his symptoms.

3.  The ALJ's finding at Step 5 of the sequential evaluation was not supported by substantial evidence where the hypothetical question to the vocational expert was incomplete.

(*See* ECF #10 at PageID 1492). The Commissioner responds that substantial evidence supports the ALJ's decision. (ECF #10 at PageID 1186).

**I.    Although the ALJ erred in evaluating one of the two the prior administrative medical findings, the error was harmless and the ALJ properly evaluated the other medical opinion evidence.**

Mr. Huber first argues the ALJ erred in assessing the medical opinion evidence and prior administrative medical findings when crafting Mr. Huber's RFC. (ECF #10 at PageID 1504).

14

Specifically, Mr. Huber argues the ALJ erred in evaluating one state agency consultant's opinion, did not address the other state agency psychological consultant's opinion, and erred in evaluating the opinion of Mr. Huber's treating psychiatric nurse practitioner. (*Id.* at PageID 1504-06). The Commissioner argues the ALJ correctly evaluated the prior administrative medical findings and the medical opinion for consistency and supportability. (ECF #13 at PageID 1529, 1533).

At Step Four, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 416.920(e). However, an ALJ is not required to rely on medical opinion evidence to craft an RFC. *Tucker v. Comm'r of Soc. Sec.*, 775 F.App'x 220, 226 (6th Cir. 2019) ("No bright-line rule exists in our circuit directing that medical opinions must be the building blocks of the residual functional capacity finding."); *Rudd v. Comm'r of Soc. Sec.*, 531 F.App'x 719, 728 (6th Cir. 2013) (rejecting plaintiff's argument that the ALJ is required "to base her RFC finding on a physician's opinion"). But an ALJ may not ignore medical opinion evidence and must explain how persuasive the ALJ finds those opinions. *See* 20 C.F.R. § 416.920c(b); *see also Reeves v. Comm'r of Soc. Sec.*, 618 F.App'x 267, 275 (6th Cir. 2015).

The ALJ determines the persuasiveness of a medical source's opinion using a five-factor analysis: (1) supportability; (2) consistency; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors that tend to support or contradict a medical opinion. 20 C.F.R. §§ 416.920c(c)(1)-(5). Supportability and consistency are the most important factors the ALJ must consider. *Id.* § 416.920c(b)(2); *see also Palmore v. Comm'r of Soc. Sec.*, No. 1:20-CV-36, 2021 WL 1169099, at *4 (S.D. Ohio Mar. 29, 2021). As such, the ALJ must

"*explain* how [the ALJ] considered the supportability and consistency factors for a medical source's medical opinions" in the written decision. 20 C.F.R. § 416.920c(b)(2) (emphasis added).

### A.   The prior administrative medical findings.

The ALJ found one state agency psychological consultant's opinion was partially persuasive but did not address the other state agency psychological consultant's opinion. The ALJ wrote:

> In the absence of a persuasive opinion from [Mr. Huber]'s own medical sources, the undersigned considered the prior administrative medical findings of the State agency psychological consultants, who opined [Mr. Huber] would be capable of comprehending and remembering a variety of task instructions, carrying out simple (1-2 step) and occasional complex/detailed (3-4 step) tasks, maintain attention, and adequately adhere to a schedule; would require a relatively isolated workstation and supervisory support when first learning tasks; would be able to related adequately on a superficial basis in an environment that entails minimal interaction with coworkers and no over-the-shoulder supervisor scrutiny, and no contact with the general public; and could adapt to routine, predictable tasks with changes that are infrequent, explained in advance, and introduced slowly. (10/21/2021, Exhibit 4A, p. 5-6). This opinion is partially persuasive, to the extent that the State agency consultant found [Mr. Huber]'s mental impairments did not preclude all fulltime work activity. The prior administrative medical finding contains several terms such as "over the shoulder supervision" and "relatively isolated." While the terms used in the prior administrative finding are not clear, they generally imply that [Mr. Huber] has a limited ability to interact with others. The undersigned has accounted for that general implication in the residual functional capacity by including a limitation to occasional interaction with coworkers and occasional, superficial interaction with the public, as limited ability to interact with others is supported by and consistent with evidence that [Mr. Huber]'s anxiety and panic attacks increase with increased interaction with others. However, such a marked degree of social limitation as set forth in this opinion regarding in his ability to carry out work tasks is not supported, as subsequent progress notes demonstrated ongoing improvement in mood, anxiety, and energy.

(Tr. 26-27). Mr. Huber contends the ALJ erred in multiple ways here: by not referring to one of the two prior administrative medical findings, failing to build a logical bridge from the one finding the ALJ did cite the ALJ's conclusions, and misunderstanding the terminology used in that finding. (ECF #10 at PageID 1505-06). Mr. Huber further argues that all opinion evidence

describes greater limitation on his ability to interact with others than the ALJ found. (ECF #14 at PageID 1543-44). I address each argument in turn.

>  1.    **The ALJ failed to analyze Dr. Matyi's opinion, but the error was harmless.**

First, a point of clarity. Mr. Huber argues the ALJ erred by not considering the prior administrative medical finding of Dr. Swain. (ECF #10 at PageID 1506). However, the ALJ cited to Dr. Swain's findings with the citation "(10/21/2021, Exhibit 4A, p. 5-6)." The administrative record contains Dr. Swain's October 21, 2021 findings in Exhibit 4A. (*See* Tr. 74). The ALJ did not address the findings of Dr. Matyi contained in Exhibit 2A, which the ALJ does not cite. In his reply brief, Mr. Huber admits the ALJ addressed Dr. Swain's findings. (ECF #14 at PageID 1545) ("Defendant is correct that the ALJ explicitly referenced Dr. Swain's limitations."). This misnomer is not dispositive of the issue.

The ALJ must "articulate how [the ALJ] considered the medical opinions and prior administrative medical findings" following the Commissioner's regulations. 20 C.F.R. § 416.920c(a). The ALJ may address multiple medical opinions or prior administrative medical findings together if they are from the same medical source. *Id.* § 416.920c(b)(1). But the ALJ cannot group multiple medical opinions from multiple medical sources in a single analysis. *See id.*; *see also Brioso v. Kijakazi*, No. 22-CV-21991-JEM, 2023 WL 5595912, at *9 (S.D. Fla. Aug. 11, 2023), *report and recommendation adopted*, 2023 WL 5563394 (S.D. Fla. Aug. 29, 2023). Dr. Swain and Dr. Matyi are different individuals and thus are different "medical sources." *See* 20 C.F.R. § 416.902(i) (defining "medical source" as an "individual licensed as a healthcare worker"). Thus, the ALJ must provide an analysis of Dr. Matyi's opinion.

Here, the ALJ did not, discussing only Dr. Swain's opinion. The ALJ stated he "considered the prior administrative medical findings of the State agency psychological consultants." (Tr. 26).

17

But after only citing Dr. Swain's opinion, the ALJ uses the singular throughout: "*this* opinion is partially persuasive . . . *the* prior administrative medical *finding* contains . . . terms used in *the* prior administrative *finding* are not clear . . . such a marked degree of social limitation set for *in this opinion* . . . ." (Tr. 26-27) (emphasis added). Thus, despite the statement to the contrary, there is no grammatically correct way to read the ALJ's decision as addressing Dr. Matyi's opinion.

Nevertheless, this error is harmless. An ALJ's error in evaluating a medical opinion can be harmless where the ALJ makes findings consistent with the opinion. *See Wilson*, 378 F.3d at 547 (holding error in evaluating a treating physician's opinion under the previous treating-physician rule may be "irrelevant" where the ALJ made findings consistent with the opinion.); *Hardy v. Comm'r of Soc. Sec.*, 554 F.Supp.3d 900, 909 (E.D. Mich. 2021) (applying the harmless-error standard in *Wilson* to an ALJ's failure to consider a medical opinion under 20 C.F.R. § 404.1520c(b), the counterpart to § 416.902c for disability insurance benefits).

Here, the prior administrative medical findings from Drs. Matyi and Swain are nearly identical. (*Compare* Tr. 66-68 *with* Tr. 74-77). Both opinions reached the same conclusions regarding Mr. Huber's concentration, social, and adaption limitations. (*Compare* Tr. 75-76 *with* Tr. 66-68). Both opinions contained the terms "over-the-shoulder supervision" and "relatively isolated workstation" (Tr. 67, 76), which the ALJ stated he incorporated into the RFC by including "a limitation to occasional interaction with coworkers and occasional, superficial interaction with the public." (Tr. 27). The single difference between the two opinions is Dr. Swain concluded Mr. Huber was markedly limited in his ability to interact appropriately with the general public while Dr. Matyi concluded Mr. Huber was moderately limited in that area. (*Contrast* Tr. 76 *with* Tr. 67).

Thus, the ALJ's findings about Dr. Swain's opinion were consistent with Dr. Matyi's opinion as the two were nearly identical. *See Beery v. Comm'r of Soc. Sec.*, 819 F.App'x 405, 408 (6th Cir. 2020) ("We will treat an ALJ's failure to articulate her reasons for the weight she assigned to a medical source opinion as harmless error if the ALJ adopted the opinion or made findings consistent with the opinion."). This is "a rare case of the ALJ's analysis meeting the goal of the rule even if not meeting its letter" because the sources were nearly identical in their conclusions and narratives. *See Nelson v. Comm'r of Soc. Sec.*, 195 F.App'x 462, 472 (6th Cir. 2006); *Wilson*, 378 F.3d at 547 (holding harmless error may exist when the ALJ met the goal of "the procedural safeguard of reasons" in § 416.927(c)(2)).

> ### 2. The ALJ properly analyzed the persuasiveness of Dr. Swain's opinion and found the greater limitations Dr. Swain described were unpersuasive.

Next, Mr. Huber argues the ALJ erred in finding Dr. Swain's opinion partially persuasive. (ECF #10 at PageID 1504-06; ECF #14 at PageID 1544). Here, the record indicates the ALJ properly analyzed the persuasiveness of Dr. Swain's findings using the factors in 20 C.F.R. § 416.920c(c). The ALJ evaluated the consistency and supportability of Dr. Swain's conclusions about Mr. Huber's limitations in social functioning and found those conclusions were supported by and consistent with the other medical evidence in the record, detailing his anxiety and panic attacks worsened the more he interacts with others. The ALJ then incorporated those conclusions into the RFC by limiting Mr. Huber to "occasional interaction with coworkers and occasional, superficial interaction with the public." (Tr. 27).

The ALJ concluded the greater limitations Dr. Swain found were inconsistent with the progress notes from Mr. Huber's psychiatric treatment that "demonstrated an ongoing improvement in mood, anxiety, and energy." (*Id.*). This conclusion is borne out in the progress

notes closest to the administrative hearing where Mr. Huber denied mood swings, energy changes, and concentration changes. (*See* Tr. 486, 492, 498, 504). Thus, the ALJ applied the required consistency and supportability factors and supported the conclusions with substantial evidence from Mr. Huber's treatment notes.

### 3. The ALJ did not err by omitting those restrictions from the RFC.

Mr. Huber further argues the ALJ did not build a logical bridge from Dr. Swain's opinion to the ALJ's the conclusion that Mr. Huber can occasionally interact with the public. (ECF # 10 at PageID 1505). Dr. Swain opined Mr. Huber can "relate adequately in an environment that entails infrequent public contact, minimal interaction from coworkers, and no over-the-shoulder supervisor scrutiny." (*See* Tr. 76). The ALJ incorporated this opinion, writing:

> The prior administrative medical finding contains several terms such as "over the shoulder supervision" and "relatively isolated." While the terms used in the prior administrative finding are not clear, they generally imply that the claimant has a limited ability to interact with others. The undersigned has accounted for that general implication in the residual functional capacity by including a limitation to occasional interaction with coworkers and occasional, superficial interaction with the public, as limited ability to interact with others is supported by and consistent with evidence that the claimant's anxiety and panic attacks increase with increased interaction with others.

(Tr. 27). Mr. Huber argues the implication of a need to work in a relatively isolated workstation, "in the context of the totality of the opinion, belies an ability to interact with coworkers or the public one-third of the workday, even on a superficial basis." (ECF #10 at PageID 1505).

The description "relatively isolated" is consistent with the Social Security Administration's definition of "occasional" to mean "very little up to one-third of the time." *See Davis v. Comm'r of Soc. Sec.*, No. 3:22-CV-1259, 2023 WL 4079200, at *8 (N.D. Ohio Mar. 30, 2023) (quoting Soc. Sec. Ruling (SSR) 83-10, 1983 WL 31251, at *5), *report and recommendation adopted*, 2023 WL 5214114 (N.D. Ohio Aug. 15, 2023). And the Sixth Circuit has held a limitation to "occasional"

interactions due to marked limitations in social interaction (as Dr. Matyi found) is not

inconsistent with an opined limitation to "superficial" interactions. *See Reeves*, 618 F.App'x at 275.

Thus, the ALJ's limiting Mr. Huber to "occasional interaction with coworkers and occasional,

superficial interaction with the public" in the RFC was erroneous given a medical opinion that

Mr. Huber needed a relatively isolated workstation. To the extent Mr. Huber argues the opinion

evidence suggested greater limitations, as mentioned previously, the ALJ did not find those the

greater limitations persuasive. This Court cannot speculate about what the medical source was

thinking when she chose her words. *Davis*, 2023 WL 4079200, at *8.

> **4.    This Court cannot reweigh opinion evidence presented to the ALJ and independently arrive at a different result where substantial evidence supports the ALJ's decision.**

Finally, Mr. Huber offers that "[f]undamental to Plaintiff's argument, however, is that all

opinion evidence describes greater limitation on Mr. Huber's ability to interact with others than

found by the ALJ." (ECF #14 at PageID 1543-44). Such an argument invites this Court to reweigh

the opinion evidence provided to the ALJ and reach a different result. This is not a proper basis to

reverse an ALJ's findings. *See Mullins v. Sec'y of Health & Hum. Servs.*, 836 F.2d 980, 984 (6th Cir.

1987). The ALJ is tasked with weighing the evidence, not this Court. *See White v. Comm'r of Soc.

Sec.*, 572 F.3d 272, 284 (6th Cir. 2009). This Court cannot overturn the ALJ's weighing of the

evidence so long as substantial evidence supports the conclusion reached by the ALJ. *Jones*,

336 F.3d at 477.

### B.    Medical opinion of Mr. Huber's treating psychiatric nurse practitioner.

Mr. Huber next argues the ALJ erred in evaluating the other medical opinion evidence,

specifically the opinion of his treating psychiatric nurse practitioner, NP Berry. (ECF #10 at

PageID 1506). The ALJ found NP Berry's opinion to be not consistent with the record, writing:

On November 17, 2021, [Mr. Huber]'s prescribing psychiatric nurse practitioner, Nicole Berry, NP, completed a checklist form statement indicating [Mr. Huber] would be off-task 20 percent or more during a normal workday, and would be absent four to five days per week. The explanation for these limitations was relatively brief, as she stated: "He has agoraphobia, panic attacks, major depression, anxiety, and he has trouble with activities of daily living." This was not fully consistent with progress notes from November 23, 2021, during which he denied racing thoughts, depression, and mood swings, and reported only some situational anxiety and irritability. Nurse Berry again described [Mr. Huber]'s condition as "very much improved." On November 30, 2021, [Mr. Huber] reported his anxiety symptoms, including anxiety and panic attacks, had improved with addition of Gabapentin at the prior visit.

* * *

The undersigned has considered the medical opinion of Nicole Berry, CNP, [Mr. Huber]'s prescribing psychiatric nurse practitioner throughout the relevant period. As noted above, this provider indicated [Mr. Huber] would be off-task 25 percent or more throughout the day, and absent between four and five days per month due to his symptoms. This opinion is unpersuasive due to several factors. This opinion is unsupported by specific references to the medical evidence and is conclusory in nature. Further, the opinion is inconsistent with both Ms. Berry's progress notes and the evidence in the file as a whole. At the most recent visit prior to completing this form, the nurse practitioner noted [Mr. Huber] denied racing thoughts, mood swings, and overall anxiety and depression symptoms had improved. Although there was waxing and waning of symptoms, often situational in nature, throughout the period, Ms. Berry consistently assessed [Mr. Huber]'s symptoms to be "very much improved," inconsistent with the extreme limitations she assessed in this checklist form. Nothing within the progress notes on or around the date of this assessment suggested that [Mr. Huber] was unable to remain on-task or had difficulty maintaining appointments. [Mr. Huber] consistently presented as alert, oriented, and in no distress. Although there were intermittent subjective complaints of concentration difficulty, these were addressed conservatively with medication for depression and anxiety. [Mr. Huber] admitted that his symptoms improved with treatment, and he was diligent about reporting increases of symptoms when he experienced them so that his provider could make adjustments. As noted above, intermittent symptom exacerbations generally responded to medication adjustments within weeks of these routine changes in the treatment plan. Ms. Berry's progress reports did not suggest prolonged periods of uncontrolled symptoms that would reasonably result in the limitations she set forth in her opinion.

(Tr. 24, 26). Mr. Huber again contends the ALJ erred in multiple ways here: by mischaracterizing

the opinion as a check-box opinion and not properly analyzing its persuasiveness and by conflating

his improving symptoms with an ability to perform work.[9] (ECF #10 at PageID 1507-08; ECF #14 at PageID 1545-47). I address each argument in turn.

### 1. The ALJ properly assessed the persuasiveness of NP Berry's opinion using the regulatory factors.

Mr. Huber argues the ALJ's analysis of NP Berry's opinion "falls short" and takes issue with the ALJ's characterization of the opinion as a "check-box opinion." (ECF #10 at PageID 1507, ECF #14 at PageID 1547). Mr. Huber contends that although NP Berry did not cite specific findings, because she listed Mr. Huber's diagnoses and her treatment notes were in the record, she nevertheless included her findings. (ECF #14 at PageID 1547). This is unconvincing.

Here, the ALJ properly analyzed the persuasiveness of NP Berry's opinion using the required factors and supported the analysis with substantial evidence. As noted earlier, the ALJ determines the persuasiveness of a medical source's opinion using a five-factor analysis: (1) supportability; (2) consistency; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 416.920c(c)(1)-(5).

First, the ALJ analyzed the opinion's supportability by writing, "[t]his opinion is unsupported by specific references to the medical evidence and is conclusory in nature." (Tr. 26). The regulations define the supportability factor as "the more relevant the objective medical

---

[9]     Mr. Huber also contends that the ALJ erred in evaluating NP Berry's opinion by not accounting for the waxing and waning of his symptoms. This argument goes toward the ALJ's crafting of the RFC, not the evaluation of the persuasiveness of NP Berry's opinion. Thus, I addressed it in Section II.D below.

evidence and supporting explanations presented by a medical source are to support his or her

medical opinion . . . the more persuasive the medical opinion . . . will be." *Id.* § 416.920c(c)(1).

Here, NP Berry's opinion is one page and provides check-marked conclusions that Mr.

Huber would require four to five times more breaks, be off-task 25 percent or more throughout

the day, be absent between four and five days per month, and be unable to engage in socially

appropriate interactions with coworkers and supervisors more than 30 percent of the time.

(Tr. 421). NP. Berry explains the limitations are "due to his mental health [diagnoses]" that "[h]e

has agoraphobia, panic attacks, major depression, anxiety, and he has trouble with ADL's." (*Id.*).

While Mr. Huber contends that NP Berry provided the support for her opinions in Mr. Huber's

progress notes outside the four corners of her opinion, the opinion does not cite any specific

progress note or mention them at all. Thus, substantial evidence supports the ALJ's determination

that NP Berry's opinion is not well supported.

Second, the ALJ analyzed the opinion's consistency by citing that Mr. Huber's progress

notes, most of which were written by NP Berry, do not suggest "prolonged periods of uncontrolled

symptoms that would reasonably result in the limitations she set forth in her opinion." (Tr. 26).

The regulations define the consistency factor as "[t]he more consistent a medical opinion . . . is

with the evidence from other medical sources and nonmedical sources in the claim, the more

persuasive the medical opinion . . . will be." *Id.* § 416.920c(c)(2).

Here, NP Berry wrote her opinion on November 17, 2021, and opined on Mr. Huber's

limitations in connection with his disability application. (Tr. 421) She explained her conclusions

were "due to his mental health [diagnoses]." (*Id.*). But NP Berry's contemporaneous progress notes

for November 2021 support the conclusion that Mr. Huber's anxiety and depression waxed and

waned independently of each other, that NP Berry was adjusting his medication to respond, and that his symptoms seemed to improve. (*See* Tr. 605, 599, 593, 587). In each of those notes, NP Berry marked Mr. Huber's improvement as "very much improved" compared to when he began treatment. (Tr. 609, 603, 597, 591). Although Mr. Huber contends the ALJ conflated Mr. Huber's improving symptoms with an ability to perform work (discussed in more detail below), to the ALJ, it was hard to reconcile the severe limitations that NP Berry indicated with her other statements in the progress notes that Mr. Huber's symptoms were improving with medication. Thus, substantial evidence supports the ALJ's conclusion that NP Berry's opinion is inconsistent with the other evidence.

> ### 2. The ALJ did not conflate the improvement of Mr. Huber's symptoms with his ability to perform work; rather his improvement was relevant to the opinion's consistency.

Mr. Huber also contends the ALJ conflated the improvement of Mr. Huber's symptoms from the start of treatment with an ability to perform work activity. (ECF #10 at PageID 1507-08). As mentioned previously, the ALJ evaluated NP Berry's opinion for its consistency with the medical record. *See* 20 C.F.R. § 416.920c(c)(2). NP Berry's treatment notes from November 2021 report Mr. Huber's condition as "very much improved" compared to when he began treatment. (Tr. 609, 603, 597, 591). While the statement is a comparative assessment of Mr. Huber's condition before and after treatment began, the ALJ was not extracting positive results and presenting them out of context. *See Rajt v. Sec'y of Health & Hum. Servs.*, 859 F.Supp. 275, 282 (E.D. Mich. 1994). Rather, the ALJ was evaluating the consistency of NP Berry's medical opinion with her own treatment notes and concluding that the two sources were inconsistent with each other, as § 416.920c(c) requires the ALJ do.

For these reasons, the ALJ properly evaluated Dr. Swain's prior administrative medical finding and the RFC was not inconsistent with the part of Dr. Swain's opinion that the ALJ found persuasive. While the ALJ should have provided a source-level analysis of Dr. Matyi's opinion, such error was harmless because Dr. Matyi's and Dr. Swain's opinions were almost identical and the ALJ's ultimate findings were consistent with Dr. Matyi's opinion. Where the ALJ disagreed with Dr. Swain's opinion, substantial evidence supported the ALJ's determinations. All of Mr. Huber's many challenges to the ALJ's conclusions are unconvincing.

Consequently, I recommend the District Court decline to remand on this basis.

## II.     The ALJ properly addressed Mr. Huber's reported symptoms.

Second, Mr. Huber argues the ALJ erred in evaluating his subjective statements in the hearing about his symptoms. Specifically, Mr. Huber contends the ALJ erred by not discussing his agoraphobia except in passing or his testimony in the hearing at all (ECF #10 at PageID 1509-10), mischaracterized his telehealth mental-health treatment as in-person (*Id.* at PageID 1512), and did not properly incorporate the waxing and waning of his symptoms. (ECF #10 at PageID 1507, 1510). The Commissioner responds that the ALJ properly assessed Mr. Huber's symptoms and recasts Mr. Huber's claims as a disfavored "cherry-picking" argument. (ECF #13 at PageID 1535, 1538). I address each argument in turn.

### A.     The ALJ addressed Mr. Huber's testimony in the administrative hearing about his agoraphobia at Step Three of the sequential analysis.

Mr. Huber argues the ALJ erred by not addressing his testimony in the administrative hearing about his agoraphobia. (ECF #10 at PageID 1510; ECF #14 at PageID 1548). While the ALJ's decision at Step Four of the sequential analysis does not mention Mr. Huber's hearing testimony, the ALJ considered Mr. Huber's testimony at Step Three. An ALJ's decision must be

read as a whole and with common sense. *Buckhanon ex rel. J.H. v. Astrue*, 368 F.App'x 674, 679 (7th Cir. 2010); *Evans v. Comm'r of Soc. Sec.*, No. 1:19-cv-2895, 2020 WL 6064112, at *13 (N.D. Ohio Oct. 14, 2020) ("While the ALJ must discuss significant evidence supporting his decision and explain his conclusions with sufficient detail to permit meaningful review, there is no requirement that the ALJ incorporate all the information upon which he relied into a single tidy paragraph."); *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004) ("Because it is proper to read the ALJ's decision as a whole . . . it would be a needless formality to have the ALJ repeat substantially similar factual analyses" in different parts of the decision.).

At Step Three, the ALJ noted that Mr. Huber "reported a history of difficulty leaving his home and being around others due to his anxiety." (Tr. 21). This refers to Mr. Huber's testimony that at the time of the hearing he had not left his house for three to four weeks. (Tr. 47). The ALJ considered this and other testimony from Mr. Huber, writing

> Despite this, [Mr. Huber] presented with intact social skills during basic interactions with a variety of medical providers, without any behavioral abnormalities . . . [Mr. Huber] described spending time with family members in their homes, suggesting he was capable of greater activity outside of his home than currently reported. [Mr. Huber] was also able to leave his home to attend medical appointments without a significant exacerbation in his symptoms.

(Tr. 21).

This analysis of Mr. Huber's testimony about his agoraphobia and the extent of the limitations it causes him shows the ALJ did address that testimony. The ALJ also mentioned Mr. Huber "described [an] educational history including homeschooling since junior high school." (Tr. 21). This reflects the ALJ also considered Mr. Huber's testimony in the hearing that he opted for homeschooling because he could not handle the social interaction due to his anxiety. (Tr. 45). While the ALJ did not cross-reference at Step Four his earlier discussion of Mr. Huber's testimony,

it is clear from elsewhere in the decision that the ALJ considered Mr. Huber's testimony about the nature of his symptoms and limitations and provided specific reasons when evaluating those subjective statements.

### B. The ALJ evaluated Mr. Huber's subjective statements of symptoms using the required regulatory factors.

Generally, "[i]t is for the [ALJ], not the reviewing court, to judge the consistency of a claimant's statements against the record evidence." *Lipanye v. Comm'r of Soc. Sec.*, 802 F.App'x 165, 171 (6th Cir. 2020). The ALJ must assess the consistency of a claimant's statements concerning the intensity, persistence, and limiting effects of symptoms of an alleged disability. SSR 16-3p, 2017 WL 5180304 at *8-9. In evaluating the severity of symptoms, the ALJ must consider a variety of factors, including the effectiveness of any medications and treatments. 20 C.F.R. § 416.929(c). Among other requirements, the ALJ's evaluation of a claimant's symptoms must find support in the record. *See* SSR 16-3p at *10.

Two other factors the ALJ considers when evaluating a claimant's subjective statements about his symptoms are "the type, dosage, effectiveness, and side effects of any medication" a claimant takes to alleviate symptoms and "the treatment, other than medication" a claimant receives for relief of symptoms. *See* 20 C.F.R. § 416.929(c)(iv), (v). While the ALJ did not expressly mention the factors by name, the ALJ's decision shows the ALJ considered them. The ALJ discussed Mr. Huber's medication and treatment history and noted that he did not receive mental-health treatment until shortly before the January 1, 2021 alleged onset-of-disability date. (Tr. 25). The ALJ characterized his treatment as "conservative outpatient treatment, with routine medication adjustments to address subjective symptom reports." (Tr. 26). Mr. Huber's mental-health treatment involved therapy and medication, which the Sixth Circuit has noted supports a

characterization as "conservative." *See, e.g., Collins v. Comm'r of Soc. Sec.*, 357 F.App'x 663, 669 (6th Cir. 2009); *Branon v. Comm'r of Soc. Sec.*, 539 F.App'x 675, 678 (6th Cir. 2013). The Sixth Circuit has also noted that a "conservative treatment approach suggests the absence of a debilitating condition." *Branon*, 539 F.App'x at 678. Thus, the nature of Mr. Huber's medication and treatment support the ALJ's conclusion that Mr. Huber's statements of disability were not supported.

### C. The ALJ did not mischaracterize Mr. Huber's mental-health treatment as in-person.

Mr. Huber contends the ALJ misunderstood that Mr. Huber's mental-health treatment to be in person (and thus inconsistent with disabling agoraphobia) when it was conducted remotely through videoconferencing. (*See* ECF #10 at PageID 1512). The ALJ does not expressly characterize Mr. Huber's mental-health treatment as in person beyond stating he "presented" at the Charak Center and to NP Berry. (Tr. 23-24). There is no need to parse what the ALJ precisely meant by choosing the word "present" as the administrative record to determine if substantial evidence supports the ALJ's inference that Mr. Huber's anxiety and agoraphobia do not prevent him from leaving his house to receive treatment. The ALJ cited that Mr. Huber's medical treatment for skin lesions was in-person as his physical vital signs were recorded at each visit. (*See, e.g.*, Tr. 249-51, 252-53, 255-57, 425, 428, 433, 435). His testosterone injections were also conducted in-person. (Tr. 457, 463, 469, 482). This evidence supports the ALJ's inference that despite his agoraphobia and anxiety, Mr. Huber can leave his house to receive treatment. Again, while the ALJ did not mention the factor by name, this finding also supports the ALJ's conclusion that Mr. Huber's treatment does not suggest a debilitating condition.

29

### D.     The ALJ properly analyzed the waxing and waning nature of Mr. Huber's symptoms in crafting the RFC.

Mr. Huber further argues the ALJ failed to address his limitations when his anxiety and depression were exacerbated. (ECF #10 at PageID 1507-08). Mr. Huber contends the Sixth Circuit's opinion in *Wilcox v. Sullivan*, 917 F.2d 272 (6th Cir. 1990), requires reversal because the ALJ did not account for the limitations Mr. Huber experiences while his symptoms are exacerbated. (ECF #10 at PageID 1507; ECF #14 at PageID 1546). I disagree.

In *Wilcox*, the Sixth Circuit addressed a disability arising from multiple sclerosis. The court concluded, "[I]n evaluating multiple sclerosis, or any other episodic disease, consideration should be given to the frequency and duration of the exacerbations, the length of the remissions, and the evidence of any permanent disabilities." *Id.* at 277. Thus, the ALJ in *Wilcox* erred in considering that the claimant, who suffered from multiple sclerosis, had worked during periods of remission. *Id.*; *see also Shaw v. Sec'y of Health & Human Servs.*, 978 F.2d 1259, at *1 (6th Cir. 1992) ("Because the . . . period wherein [the claimant] attempted to work and attend school was unquestionably a period of remission, we believe the ALJ erred in placing undue reliance on this brief and temporary interruption of [her] progressively disabling [multiple sclerosis].") (citations omitted)); *Cohen v. Sec'y of Dep't of Health & Human Servs.*, 964 F.2d 524, 530-31 (6th Cir. 1992) (stating that the capacity to pass one to two law school classes per semester did not indicate that claimant, who suffered from chronic fatigue syndrome, was capable of sustaining substantial gainful employment in the national economy).

Here, the severity of Mr. Huber's depression and anxiety has varied throughout the course of the relevant time period. But this is not a case where the ALJ impermissibly accounted for a claimant's return to work during periods of remission. Mr. Huber has never worked and has not

worked since his alleged onset date. Rather, this is a case where substantial evidence in the record supports the ALJ's conclusion that the exacerbation of his symptoms was "intermittent," "generally responded to medication adjustments within weeks," and "did not suggest prolonged periods of uncontrolled symptoms that would reasonably result in the limitations she set forth in [NP Berry's] opinion." (*See* Tr. 26).

The ALJ must evaluate the location, duration, frequency, and intensity of Mr. Huber's symptoms when evaluating his subjective statements. 20 C.F.R. § 416.929(c)(ii). Mr. Huber has not been hospitalized because of his depression or anxiety. The progress notes suggest that while some weeks Mr. Huber's anxiety and depression symptoms would improve and some weeks his symptoms would deteriorate, these shifts were generally responsive to medication. For example, on January 5, 2021, Mr. Huber reported his depression symptoms would wax and wane and he had trouble sleeping. (Tr. 323). In response, NP Berry prescribed Remeron to aid his sleep, anxiety, and depression. (Tr. 326). By January 14, Mr. Huber's progress note reported he thought he was doing well, he "denie[d] all mental health symptoms," and was satisfied with his medication regimen. (Tr. 314).

For these reasons, the ALJ's decision as a whole indicates that the ALJ considered the relevant evidence and applied the regulatory factors to evaluate Mr. Huber's statements, though ALJ did not expressly address Mr. Huber's hearing testimony within the analysis at Step Four. The ALJ analyzed Mr. Huber's medication and treatment for his mental-health diagnoses under 20 C.F.R. §§ 416.929(c)(iv) and (v) and found they were inconsistent with the debilitating condition he alleged. The ALJ also noted that Mr. Huber's anxiety and agoraphobia do not prevent him from being able to receive in-person medical care. The ALJ also analyzed under § 416.929(c)(ii) that Mr.

Huber's symptoms are responsive to medication adjustments and that his progress notes do not suggest prolonged periods of uncontrolled symptoms.

Thus, the ALJ properly evaluated Mr. Huber's subjective statements about his symptoms by applying the regulatory factors and the decision contains substantial evidence to support that analysis.

Consequently, I recommend the District Court decline to remand on this issue.

### III. Although the hypothetical question posed to the vocational expert by the ALJ was incomplete, that error was harmless.

Finally, Mr. Huber argues the ALJ erred at Step Five in not asking the VE to consider a hypothetical individual with Mr. Huber's age and education. (ECF #10 at PageID 1513; ECF #14 at PageID 1549-50). The Commissioner argues the error was harmless. (ECF #13 at PageID 1540).

At Step Five of the sequential analysis, the burden shifts to the Commissioner to establish whether the claimant has the RFC to perform available work in the national economy. *Walters*, 127 F.3d at 529. The ALJ considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* To that end, the VE's purpose is to testify on the basis of a claimant's "residual functional capacity and . . . age, education, and work experience" and assesses whether the claimant "can make an adjustment to other work." *See* 20 C.F.R. § 416.920(a)(4)(v); *see also Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). The VE's testimony is directed solely to whether, given a claimant's age, experience, and education, along with the ALJ's assessment of what the claimant "can and cannot do," there exist a significant number of employment opportunities for her in the regional and national economies. *Webb*, 368 F.3d at 633.

A vocational expert's testimony is evidence of non-disability only if the hypothetical question to which he responds is an accurate summation of the claimant's medical limitations and vocational factors. *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975) (per curiam); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975). "In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010).

The transcript of the administrative hearing reflects the ALJ posed to the VE a hypothetical individual with no past work who can perform work at all exertional levels; must work in a static work environment; is limited to simple, routine, repetitive tasks; is limited to occasional interaction with coworkers; is limited to occasional superficial interaction with the public; and cannot perform any tasks involving arbitration, negotiation, confrontation, responsibility for the safety of others, or directing the work of others. (Tr. 56-57). In none of the four permutations did the ALJ expressly identify the hypothetical individual as having Mr. Huber's age or education. Mr. Huber's attorney did not raise the issue in the hearing or question the VE about the impact of those factors.

The Sixth Circuit has not clearly addressed whether an ALJ's commits prejudicial error in not expressly instructing a VE to consider a hypothetical person with the claimant's age and experience. The Sixth Circuit has suggested that an ALJ not expressly instructing a VE to consider a claimant's disabilities can be harmless if the VE otherwise had independent knowledge of those disabilities. *See Bradford v. Sec'y of Dep't of Health & Human Servs.*, 803 F.2d 871, 874 (6th Cir. 1986) ("Furthermore, the record demonstrates that the vocational expert had examined plaintiff's

file and familiarized himself with the contents of the medical reports and other exhibits. Thus, the vocational expert was basing an opinion on specific knowledge of the plaintiff, not just a hypothetical person."); *see also Chandler v. Sec'y of Health & Human Servs.*, No. 93-4213, 1994 WL 669670, at *3 (6th Cir. 1994) (per curiam) ("Here, although the hypothetical question made no specific reference to Chandler's borderline IQ, reading disorder, or illiteracy, the vocational expert was aware of these conditions due to Chandler's own testimony.").

At least one judge in this district has commented that an "ALJ's failure to explicitly instruct the vocational expert to consider age, education, and work experience" could be a "procedural misstep that may constitute harmless error." *Rego v. Comm'r of Soc. Sec.*, No. 3:12-CV-00034, 2013 WL 1181443, at *3 (N.D. Ohio Mar. 21, 2013).[10] Other district courts in the Sixth Circuit have applied the analysis in *Bradford* and *Chandler* when the ALJ did not instruct the VE to consider a claimant's age, experience, and work experience. *See Vance v. Comm'r of Soc. Sec.*, No. 3:11-CV-172, 2012 WL 1931863, at *11 (S.D. Ohio May 29, 2012); *Trumph v. Comm'r of Soc. Sec.*, No. 00-10433, 2004 WL 1773421, at *4 (E.D. Mich. July 9, 2004).

Here, the VE was present for the entire hearing, listened to Mr. Huber's testimony, and familiarized herself with the contents of Mr. Huber's file, including his work history. (Tr. 56). The transcript of the administrative hearing does not suggest the VE considered a hypothetical person with more than Mr. Huber's high school education. The VE cited three jobs in response to the

---

[10]     Mr. Huber argues that commentary is dicta. In *Rego*, the court reversed the ALJ's decision because the ALJ erred at Step Four by failing to assign weight to a treating physician's opinion. 2013 WL 1181443, at *3. Thus, the ALJ's error at Step Five in *Rego* was not essential to the court's holding. I express no opinion on whether the holding is dicta and do not rely on *Rego* except as an example of this circuit's limited case law addressing whether this specific error warrants remand.

ALJ's hypotheticals that could be performed, merchandise marker, router, and sorter of small parts. (Tr. 57). Those three jobs require at most a level two reasoning development and level one language and mathematical development and thus are not inconsistent with Mr. Huber's education.[11] Although the ALJ did not instruct the VE to consider a person of Mr. Huber's age and education, the record does not demonstrate the VE opined on a hypothetical person with a different age or education.

Thus, while the ALJ erred in posing the hypothetical person to the VE without expressly identifying the hypothetical individual as having Mr. Huber's age or education, any error was harmless because the record indicates the VE independently knew Mr. Huber's age and education and the VE's opinion was consistent with those vocational factors. *See Bradford,* 803 F.2d at 874; *Chandler,* 1994 WL 669670, at *3. Consequently, I recommend the district court decline to recommend remand based on this error.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's decision denying supplemental security income.

Dated: July 8, 2024

---

[11]     *See Marker*, *Dictionary of Occupational Titles*, https://occupationalinfo.org/22/222587038.html (last accessed July 8, 2024); *Router, Dictionary of Occupational Titles*, https://occupationalinfo.org/22/222587038.html (last accessed July 8, 2024); *Nut Sorter, Dictionary of Occupational Titles*, https://occupationalinfo.org/ 52/521687086.html (last accessed July 8, 2024).
Level two reasoning development involves applying common-sense understanding to detailed but uninvolved written or oral instructions. Level one language development involves reading 95-120 words per minute and writing simple sentences. Level one mathematical development involves basic arithmetic operations. *See Components of the Definition Trailer, Dictionary of Occupational Titles,* https://occupationalinfo.org/appendxc_1.html (last accessed July 8, 2024).

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).

36